UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

RARED MANCHESTER NH LLC,               )
                                       )
        Plaintiff                      )
                                       )
v.                                     )   2:10-cv-00203-GZS
                                       )
RITE AID OF NEW HAMPSHIRE INC, et al., )
                                       )
        Defendants                     )

## RECOMMENDED DECISION

This jury-waived, landlord-tenant dispute is before this court based upon diversity

jurisdiction.[1]  In its complaint, Rared seeks contract-related equitable remedies and pecuniary

relief in connection with a 1996 lease with Rite Aid of New Hampshire and Rite Aid Corporation

("Rite Aid") based upon the doctrine of mutual mistake, breach of fiduciary duty/constructive

trust, and/or misrepresentation.  Rite Aid has moved for summary judgment, in part based on the

statute of limitations, and the Court has referred the motion for report and recommendation

pursuant to 28 U.S.C. § 636.  Based upon the summary judgment record developed by the parties

and the high standard required to toll the statute of limitation, I now recommend that the Court

grant the defendants' motion for summary judgment because the plaintiff's action is time barred.

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by:

---

[1]        Despite its name, Plaintiff Rared Manchester NH, LLC ("Rared") is a Maine entity.

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). By local rule, summary judgment facts are introduced by means of "a separate, short, and concise statement of material facts," which statements must be supported by record citations. D. Me. Loc. R. 56(b), (c). The Court's review of the record is guided by the moving party's statement, the non-moving party's opposing statement, including any additional statement, and the moving party's limited reply statement. D. Me. Loc. R. 56(b), (c), (d); <u>see also</u> <u>Toomey v. Unum Life Ins. Co.</u>, 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). Appropriate record sources include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

The non-moving party is entitled to have the summary judgment facts considered in the light most favorable to its cause. <u>Wilson v. Moulison N. Corp.</u>, 639 F.3d 1, 6 (1st Cir. 2011). If the Court's guided review of the record reveals evidence sufficient to support a judgment in favor of the non-moving party on one or more of her claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims. Unsupported claims are properly dismissed. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

**STATEMENT OF FACTS**

The parties' statements of material facts consist of the Defendant's Statement of Undisputed Material Facts (Def.'s Stmt., Doc. No. 19), the Plaintiff's Opposing Statement with Additional Statement of Material Facts (Pl.'s Opposing Stmt. or Pl.'s Additional Stmt., Doc. No. 26), and the Defendant's Reply Statement of Material Facts (Def.'s Reply Stmt., Doc. No. 30).

In late 1994, Stephen Dubord was approached by Bruce Carrier, then a real estate director for Rite Aid Corporation, and asked if he was interested in developing free-standing store sites for Rite Aid. (Pl.'s Additional Stmt. ¶ 7.) After investigating the feasibility of the proposal, and developing a relationship with a local contractor, Dubord accepted the offer. The first two sites to be developed were in Pittsfield, Maine and Winslow, Maine. Dubord set up a corporation by the name of Rared Company, Inc. to develop the sites. (Id. ¶ 8.). Rite Aid had a prototype for the stores that it wished to construct at the relocated sites. Rite Aid provided Rared with a spec book that set forth all of the specifications for the new prototype. Using the spec book, Rared's contractor came up with estimated costs to build the new prototype. Dubord then transferred the estimated building costs to a pro forma that also detailed the site acquisition costs, site development costs and soft costs. The pro forma was submitted to Bruce Carrier for presentation to the Rite Aid real estate committee. Once the pro forma was approved by the real estate committee, the project made its way to Rite Aid's legal department, which negotiated the lease agreements with Dubord. (Id. ¶ 9.) At some point in time after the Pittsfield, Maine and Winslow, Maine pro formas were approved, Rite Aid sent Rared a draft lease for each location. After Dubord reviewed the leases and conferred with others, Dubord and a Rite Aid representative had a series of back and forth negotiations about those two initial leases and

3

eventually a Rite Aid representative, Alan Garubba, traveled to Maine to meet personally with Dubord and "hammer out their differences" before the two initial leases were signed. (Id. ¶ 11.)

During the negotiations on the first two leases, Garubba and Dubord went through the major provisions of the lease paragraph by paragraph, including the exclusions from the definition of gross sales (so-called carve-outs). During that time they had conversations to the effect that they were negotiating the "base lease" language, not just for the first two "deals," but for future "deals." Terms specific to a given site would obviously change, such as date of delivery and the dollar amount of base rent, but Dubord did not expect the basic business terms to change, without further discussion. However, Garubba never explicitly stated that the business terms would not change in future leases. (Id. ¶ 14; Def.'s Reply Stmt. ¶ 14; Dubord Dep. Tr. at 163:14—164:16, Doc. No. 19-1.)

The parties agree that on April 2, 1996, Rite Aid of New Hampshire, Inc. and Rared Company, Inc. entered into a lease for premises located at the easterly side of North Elm Street between Penacook and Sagamore Streets in Manchester, NH. (Def.'s Stmt. ¶ 1.) Article 26 of the Lease set forth the rent payment provisions for the Premises. (Id. ¶ 2.) The first paragraph of Article 26 contained a provision that provided for an increased rent payment if the store's adjusted gross revenues exceeded certain targets. Specifically, under the first paragraph of Article 26, the gross sales were adjusted downward to reflect the deduction of certain sales categories from gross sales. If the base rent was less than 2.5% of the adjusted gross sales, then Rared received the difference between the two amounts. (Id. ¶ 4.) Article 26 specifically delineated the sales items that were excluded from the calculation of gross sales for determination of rent payment:

> Tenant herein covenants and agrees to pay the Landlord two and one half (2.5%)
> percent of Tenant's gross sales annually against all rent due under this Lease.

> Gross sales shall include the sale of all merchandise at the Premises, but shall exclude: (a) sales for which cash has been refunded or rejected, to the extent of such refund or reject; (b) any and all sales, use, excise or similar taxes imposed on any items sold by Tenant; and (c) sales of cigarettes, tobacco related products, newspapers and magazines; (d) alcoholic beverages and lottery tickets; (e) amounts in excess of tenant's cash sale price charged on sales made on credit; (f) sales of merchandise to Tenant's employees at the customary employee discount; (g) sales of prescription drugs reimbursed by third party payors; (h) receipts from amusement devices, public telephones, weighing and blood pressure machines; (i) sale of postage stamps, traveler's cash checks, money orders, credit card service fees or similar items; (j) container deposits; (k) sale of merchandise to physicians at the customary discount; milk and milk products; (m) bread and bread products; (n) soft drinks; and (o) window washer solvent.

(Id. ¶ 5.)  In the first paragraph of Article 26, subsection (g) explicitly excluded "sales of prescription drugs reimbursed by third party payors."  (Id. ¶ 6.)  The Manchester lease has no fine print, footnote or appendix.  (Pl.'s Additional Stmt. ¶ 24.)

Under Article 26, the base rent was $206,047.40 per annum during the original term of the lease:

> "Provided, however, that Tenant shall pay as a minimum rent against percentage rent as follows: (a) TWO HUNDRED SIX THOUSAND FORTY SEVEN and 40/100 ($206,047.40) DOLLARS per annum during the original term of this Lease in equal monthly installments of SEVENTEEN THOUSAND ONE HINDRED SEVENTY and 61/100 ($17,170.61) DOLLARS."

(Def.'s Stmt. ¶ 3.)

Rared's principal was Stephen Dubord, a 1973 graduate of the University of Maine Law School.  Dubord passed the Maine bar examination in 1973 and entered into the private practice of law after passing the bar.  Dubord continued to practice law full time until 1997 and was practicing real estate law during the negotiation of the Lease in 1996.  One of the two areas in which Mr. Dubord concentrated his law practice was the area of real estate law, concentrating on title examinations, drafting title opinions, and conducting residential and commercial closings.  Beginning in the late 1980s or early 1990s, Mr. Dubord began to develop real estate properties as

a separate business venture, primarily converting sporting camp complexes into condominiums. By the mid-1990s, Dubord had been involved in at least seven various real estate projects as a developer. (Def.'s Stmt. ¶¶ 8-13; Pl.'s Opposing Stmt. ¶ 13.) Dubord, the representative of Rared NH, testified that the language contained in Article 26 excluding from gross sales prescription drug sales reimbursed by third party payors was unambiguous. (Def.'s Stmt. ¶ 7.)

Alan Garubba was the attorney in Rite Aid's legal department who prepared the Manchester lease with Rared. Garubba also prepared the five prior leases with Rared and many of the subsequent leases. (Pl.'s Additional Stmt. ¶ 10.) Rite Aid qualifies this statement and admits only that Garubba was the primary contact point between Rite Aid and Rared. (Def.'s Reply Stmt. ¶ 10.) According to Garubba, the company probably intended the prescription drug exclusion to be part of the Lease. (Garubba Dep. Tr. at 63:12-14, Doc. No. 20-2.)

On February 26, 1996, prior to execution of the Manchester lease, Alan Garubba sent Dubord a draft of the Manchester lease for review. Dubord reviewed those sections of the lease specific to the Manchester site. He did not review the entire lease. (Pl.'s Additional Stmt. ¶ 4). By letter dated March 11, 1996, Dubord contacted Rite Aid prior to execution of the Lease, suggesting changes to Articles 6 and 22 and stating "I have not read the lease line by line yet, but based on the assumption that it is identical to my other leases in all material respects, I am ready to execute if we are in agreement on the revisions I have suggested above." (Id. ¶ 4; Dubord Dep. Ex. 3, ECF Page ID # 151, Doc. No. 19-1.) There is no indication in the summary judgment statements that Rite Aid ever directly responded to the statement in the letter that "I have not read the lease line by line yet, but based on the assumption that it is identical to my other leases in all relevant respects, I am ready to execute . . ." Rather, the record reflects that Rite Aid remained silent and did not respond in regard to Dubord's assumption. (Def.'s Stmt. ¶

19, citing Dubord Dep. Ex. 7, ECF Page ID # 192.) When the draft of the Manchester lease was forwarded to Rared by Garubba, Dubord reviewed only those parts of the lease specific to that project such as "start of completion, date of delivery, dollar amount of rent, [and] things that would change from the normal standard business terms that the parties had already negotiated." He did not review the entire lease. Dubord trusted Rite Aid not to insert any new language into a draft that they had not discussed, and they had not discussed excluding all sales of prescription drugs reimbursed by third party payors from the definition of gross sales. The sales of prescription drugs made up well over half of all gross sales companywide in fiscal years 2011, 2010, and 2009, and the sale of prescription drugs reimbursed by third party payors made up approximately 95% of all prescription drug sales. (Pl.'s Additional Stmt. ¶ 17.)

Sometime thereafter, Garubba sent "four execution copies" of the Manchester lease to Dubord with a cover letter stating that he had revised the lease to accommodate the concerns raised in Dubord's previous letter of March 11, 1996. He asked Dubord to execute all four copies and return them to him. He would then sign all four copies and return two fully executed copies to Dubord. The four "execution copies" contained the prescription drug exclusion. Garubba made no mention of this fact in his letter and did not communicate this fact to Dubord or to Rared in any other manner. Dubord signed and returned all four Manchester lease copies to Mr. Garubba. (Pl.'s Additional Stmt. ¶ 5). The Prescription Drug Exclusion is contained in the first paragraph of Article 26 of the Lease and is in the same plain type as the other exclusions found in Article 26. Dubord understood that Alan P. Garubba, Esq. represented the interests of Rite Aid, not Rared, in the negotiation of the Lease. (Def.'s Stmt. ¶¶ 20-21.)

Rared developed 31 sites for Rite Aid. The leases for all but the last two contained percentage rent clauses. Of the 29 leases which contained percentage rent clauses, only the

Manchester lease, which was the sixth lease entered into between Rared and a Rite Aid subsidiary, included the prescription drug exclusion. (Pl.'s Additional Stmt. ¶ 3). When developing sites subsequent to the first two sites, Rite Aid (usually Alan Garubba) would provide Dubord with a draft lease which Dubord believed was based on the template they had thoroughly negotiated (the first two leases). Most substantive changes were to issues specific to the particular location or required by Dubord's lenders. (Id. ¶ 15; Def.'s Reply Stmt. ¶ 15.)

Occasionally, other substantive changes were made but they were discussed first. For example, at one time Rite Aid was considering keeping stores open all night. It felt, however, that sales of prescription drugs during those night hours would barely cover the cost of keeping the pharmacies open. It, therefore, discussed with Dubord excluding the sales of prescription drugs during the night hours. He agreed. Consequently, Dubord has seven stores that exclude from the definition of gross sales the sale of prescription drugs between the hours of 10:00 p.m. and 7:00 a.m., and two stores that exclude the sale of prescription drugs from the definition of gross sales between the hours of 11:00 p.m. and 7:00 a.m. The Manchester lease, which excludes all prescription drugs from gross sales, was never discussed in the same fashion as these other leases. There were also four sites (Brewer, Dover-Foxcroft, Milo and Presque Isle) that were reduced to 2% percentage rent clauses, rather than Dubord's standard 2.5% percentage rent clauses. Again, however, these changes were discussed with Dubord in advance. (Pl.'s Additional Stmt. ¶ 15). An exclusion for certain types of ATM transactions was included in 16 of Rared's leases. When the night-time prescription drug exclusion and the ATM exclusion were added, they were listed at the end of the then existing exclusions, not in the middle of the paragraph containing the exclusions. The prescription drug exclusion was added to the Manchester lease in the middle of the exclusions (found in the first paragraph of Article 26 of the

lease), not at the end, requiring the re-lettering of the exclusions coming thereafter. (Pl.'s Additional Stmt. ¶ 25). There were also two sites—Bristol, New Hampshire and Caribou, Maine—whose leases had 1.5% percentage rent clauses, not the standard 2.5% clauses, at the time they were executed. Dubord did not catch these errors until after the leases were signed. Upon contacting Rite Aid, Garubba agreed that the percentage rent had been erroneously stated, corrected the error and sent new pages to be inserted in the signed leases. (Pl.'s Additional Stmt. ¶ 16).

Of the 29 sites Rared developed for Rite Aid containing percentage rent clauses, only two other sites have generated any percentage rent to date - Boothbay Harbor, Maine and Belfast, Maine - both on the Maine coast. The Boothbay Harbor store generates about $10,000.00 per year in percentage rent; Belfast about $90,000.00. (Id. ¶ 21). Most of the other stores Rared developed for Rite Aid have reportable annual gross sales in the 3.5 to 4.5 million dollar range after the usual carve-outs (i.e. with sales of prescription drugs reimbursed by third party payors included in the gross sales figures). (Id. ¶ 22).

Dubord believed he had a friendly relationship with Garubba and others in the Real Estate and Legal Departments at Rite Aid. After completing their negotiations and executing the leases, Dubord, Carrier and Garubba went out for dinner and spent time on Great Pond in Dubord's boat. Although the next three leases were signed in the winter, on January 31, 1996, they met in Maine again to sign the leases, and again celebrated with dinner and a few beers. (Id. ¶ 12). Carrier told Dubord on several occasions that the Rite Aid real estate group enjoyed working with him. (Id. ¶ 13).

Rared Co. assigned the Lease to Rared NH on or about September 18, 1997. Neither Rared Co. nor Rared NH sought to delete the Prescription Drug Exclusion in Article 26(g) at the

time of the assignment. At the same time in September 1997, Rared did ask for at least eight specific amendments to the Lease. Included among the amendments requested by Rared in September 1997 was a revision to Article 26 of the Lease. Specifically, Rared requested the following deletion: "The following paragraph of Article 26 of the Lease is hereby deleted. The foregoing rental figures were calculated based on a building with an exterior size of 11,180 square feet and shall be adjusted if the exterior size of the premises, as constructed, measures more or less than 11,180 square feet." The first paragraph of Article 26, on page 9 of the lease, contains the percentage rent clause followed by the exclusions from the definition of percentage rent. The amendment to Article 26 eliminated the next to last paragraph of the Article related to the square footage, located on page 10 of the lease. All this amendment did was eliminate this paragraph. Dubord did not review Article 26 in its entirety when he drafted this amendment. (Pl.'s Additional Stmt. ¶ 27.)

Dubord did not read the entire lease when Rared assigned it to Rared Manchester NH, LLC. He is the sole shareholder of Rared and the sole member of Rared Manchester NH, LLC. The assignment was made for one reason only. Rared's permanent financing lender, Conseco Mortgage Capital, Inc., required that the property which was being leased be owned by a single purpose entity, whose only purpose was to own, rent and manage that piece of property. (Pl.'s Additional Stmt. ¶ 18.) The First Amendment to Lease was signed on the same date as the lease was assigned to Rared Manchester NH, LLC. Although both Rared and Rite Aid wanted the amendments completed before the assignment, they were not specifically in conjunction with each other, although at least some of the amendments were at the specific request of Conseco. (Pl.'s Additional Stmt. ¶ 19; Def.'s Reply Stmt. ¶ 19.) The percentage rent clause was

important to Mr. Dubord because the stores he developed for Rite Aid generate very little cash in excess of costs until the mortgage is paid in full (20 years). (Pl.'s Additional Stmt. ¶ 26).

When Rared brought forward the issue of its disagreement[2] with the Prescription Drug Exclusion, the parties entered into a series of tolling agreements related to the statute of limitations. The first tolling agreement was executed on August 2, 2007. The last tolling agreement was executed on March 29, 2010, and expired on May 28, 2010. On May 28, 2010, Rared filed its Complaint against Rite Aid with this Court. In 2009, when the parties were still trying to resolve this dispute without litigation (the parties had been trying to resolve the issue since mid-2005), Rared requested that Rite Aid provide it with figures evidencing the sales of prescription drugs reimbursed by third party payors for the years subsequent to the execution of the lease. Rite Aid provided preliminary figures for the years 2004-2008. When Dubord questioned why no figures had been provided for the years prior to 2004, he was told that the threshold for percentage rent had not been reached in those years. (Pl.'s Additional Stmt. ¶ 20).

---

[2]         Rared explains:

> Mr. Dubord discovered the fact that the prescription drug exclusion had been inserted in the percentage rent clause in mid-2005. He had received a call from the Manchester Code Enforcement Officer in May 2004 stating that Rite Aid NH had two unregistered motor vehicles and two temporary storage facilities (trailers) parked on the premises in violation to the City's ordinances. After a call to the store manager, they were removed. Toward the end of January 2005, Mr. Dubord received a second call from the Code Enforcement Officer. Two temporary storage trailers were again on the property. Mr. Dubord then had conversations with Tim Sears of Rite Aid who talked about expanding the Manchester store and about having difficulty keeping enough merchandise on the shelves. He stated that it was one of the busiest stores Rite Aid had. This prompted Mr. Dubord to investigate further. After reviewing the annual gross sales figures, which did not suggest this was a particularly busy store, he had further conversations with Tim Sears. Mr. Sears then explained that Rite Aid had acquired an independent pharmacist in the area and that was the reason the store was so busy. He then reviewed his lease and discovered that the prescription drug exclusion had been inserted in Article 26 of Rared's lease with Rite Aid NH.

(Pl.'s Additional Stmt. ¶ 6 (citation omitted).) Rite Aid denies paragraph six on the basis that Dubord's supporting affidavit contains irrelevant and inadmissible evidence. I include the entire paragraph as a footnote because it does provide background information, at least from the plaintiff's perspective. I also include the paragraph because it is a classic example of a violation of Local Rule 56(b) which requires each material fact to be set forth in a "separately numbered paragraph." The only remotely relevant and material fact, that Dubord discovered the prescription drug exclusion in mid-2005 as the result of an inquiry on an unrelated issue, could be set forth as a separate fact, period.

Rared's complaint recites three counts. The first count asserts a "mutual mistake" and advances contract theories of recovery, including reformation of the contract to delete the prescription drug exclusion. The second count alleges the existence of a fiduciary duty and seeks an accounting, damages, reformation, and payment of unpaid rents into a constructive trust. The third count is captioned "Misrepresentation/Restatement Tort § 551" and requests similar relief. (Compl., Doc. No. 1.) Despite the alternative captions used for each of the three counts, Rared's pleas for relief are the same for all three counts. In effect, it is not clear from the pleadings that counts two and three necessarily sound in tort rather than in contract. For example, there is no request for non-pecuniary damages and the overriding plea for relief is for the payment of rental income based on a percentage of gross sales that does not exclude third-party payments for prescription drugs.

With its motion for summary judgment, Rite Aid requests entry of judgment in its favor on all three counts. According to Rite Aid, the undisputed facts fail to generate a trial-worthy issue and are otherwise time barred. (Mot. for Summary J. at 7-14, Doc. No. 18.) In opposition to the motion, Rared has conceded that the "mutual mistake" count is time barred.[3] (Pl.'s Opp'n Mem. at 8, Doc. No. 25.) Consequently, judgment should enter for Rite Aid on the first count in the complaint, which leaves the latter two counts for consideration. Rared disputes the contentions that these counts are time barred and that it has failed to generate genuine issues for trial on these claims.

For reasons that follow, I conclude that there is a genuine issue of material fact whether relief would be warranted based on Rite Aid's non-disclosure concerning the prescription drug

---

[3]      Rite Aid cites case law holding that a contract claim for mistake accrues on the date of the mistake and Rared does not challenge this position. (Mot. for Summary J. at 7; Pl.'s Opp'n Mem. at 8.)

exclusion it inserted into the Manchester lease. However, I am not persuaded that this species of non-disclosure rises to the level of fraud by "active concealment," which is the standard the Law Court has imposed with respect to tolling the statute of limitation based on fraud. The discussion begins with Rite Aid's challenges to the merits and then turns to the statute of limitations tolling issue. The parties agree that Maine law applies to their dispute. (Mot. for Summary J. at 7; Pl.'s Opp'n Mem. at 4, 9.)

## A. Substantive Claims

Rite Aid challenges all three counts on the merits. The merits of count I are not discussed in light of Rared's concession that this count is time barred. For reasons that follow, count II is subject to dismissal based on the absence of a fiduciary relationship. Count III, on the other hand, is an actionable theory recognized by the authors of the Restatement that the Law Court would likely recognize as viable, although not necessarily as a tort claim rather than a contract claim.

### 1. Fiduciary duties (count II)

As for the existence of a special relationship of confidence and trust, Rared contends that such a relationship existed here because its principal, Mr. Dubord, did, in fact, place trust in those decision makers at Rite Aid with whom he dealt on an ongoing basis. Rared offers this argument in support of its second count (breach of fiduciary duty) and marshals the facts as follows:

> In this particular case, Mr. Dubord and Mr. Garubba spent a significant amount of time negotiating the terms of the first two leases. They discussed and understood that the lease language they were negotiating would be used in subsequent leases. Each understood that the basic business terms of the negotiated leases would not be changed without discussion. They socialized together. Bruce Carrier told Mr. Dubord on several occasions that the people in the Rite Aid real estate group liked working with him. He got the job done on time, didn't argue with them, and did not give them the hassles that some other developers did. As Mr. Dubord testified, Rite Aid made him feel part of a team. As a result, he trusted Rite Aid not to try to sneak

one by on him.  The fact that they evidently did so is a breach of that trust.  In the context of the specific facts of this case, a fiduciary relationship existed.

(Pl.'s Opp'n Mem. at 11.)  In effect, Rared contends that a history of good relations gave rise to a fiduciary relationship.

For purposes of this discussion, there is no material distinction between a relationship of confidence and trust and a fiduciary relationship.  The Law Court has explained that these labels are interchangeable and give rise to the same duties.  <u>Stewart v. Machias Sav. Bank</u>, 2000 ME 207, ¶ 11, 762 A.2d 44, 46 n.1 (citing <u>Ruebsamen v. Maddocks</u>, 340 A.2d 31, 36 (Me. 1975)).  "The question of whether one party owes a fiduciary or other duty of due care to another is a question of law."  <u>Fortin v. Roman Catholic Bishop of Portland</u>, 2005 ME 57, ¶ 35, 871 A.2d 1208, 1220.  What is needed to demonstrate the required relationship is evidence that one party placed its trust and confidence in the other and that there was a great disparity of position and influence favoring the one in whom the trust was placed.  <u>Camden Nat'l Bank v. Crest Constr., Inc.</u>, 2008 ME 113, ¶ 13, 952 A.2d 213, 217.  The Law Court has held that the mere existence of a creditor-debtor relationship or a mortgagor-mortgagee relationship will not establish the existence of a confidential or fiduciary relationship.  <u>Id.</u>, ¶ 15;  <u>Stewart</u>, 762 A.2d at 46, ¶ 11.  By extension, the mere existence of a landlord-tenant relationship will not establish a confidential or fiduciary relationship.  What is required is additional evidence related to the actual placement of an uncommon trust in another that creates not only a disparity of position or influence, but a "great disparity";  the kind of disparity that arises from "diminished emotional or physical capacity or . . . the letting down of all guards and bars."  <u>Stewart</u>, 762 A.2d at 46, ¶¶ 10-11.

Mr. Dubord has described facts and circumstances depicting an amicable business relationship, including a process of mutually developing a lease template.  These circumstances may well explain why Mr. Dubord did not feel he needed to scrutinize every provision in the

Manchester lease after he and Mr. Garubba had thoroughly negotiated the first two leases and executed other leases based on the template. These circumstances may also explain why he anticipated that he would be notified of any material changes in the lease template. However, the circumstances do not justify the imposition of a fiduciary or confidential relationship because they do not depict a relationship outside the mainstream of business practice. Rared's view is that it would be good for business to impose fiduciary duties on such relationships because it would relieve contracting parties in the computer age of the "huge burden" of "hav[ing] to read each draft word for word to make sure the other side had not surreptitiously changed the wording of sections not even being discussed." (Pl.'s Opp'n Mem. at 11-12.) I am not persuaded that such a broad imposition of fiduciary duties would be conducive to the creation of a better business environment.[4] In any event, it is not this Court's role to steer Maine law based on such policy concerns. The Law Court restricts fiduciary relationships to those relationships involving great disparities of position and an uncommon degree of trust and confidence. Even if Rared's alleged placement of trust in Rite Aid is sufficient to support a finding of "trust," as a matter of law the summary judgment record is insufficient to justify the imposition of a fiduciary duty because of the absence of a great disparity of position and influence between the parties.

  2.  *Nondisclosure of another party's mistake as a basis for contract relief*

Rared asserts its third count as a claim arising under section 551 of the Second Restatement of Torts. Rite Aid objects that the Law Court has never expressly recognized the tort described in this section of the Restatement. (Mot. for Summary J. at 12-13.) Rite Aid also contends that the facts do not depict nondisclosure because the language at issue was disclosed on the face of the lease. (Id. at 13.)

---

[4]  Nor am I persuaded that the age-old practical wisdom of reviewing contract language prior to signing has become obsolete in the age of computer processing.

Although the Law Court has not referenced section 551 of the Second Restatement of Torts in any of its published opinions, there is no reason to assume that the Law Court would not follow a widely-recognized common law rule outlined by the authors of the Restatement and preclude a Maine court from exercising legal or equitable powers to remedy harms arising from material non-disclosures in a transactional scenario. The principle related by the restatement authors is restricted to the context of transactional relationships and provides as follows:

§ 551 Liability for Nondisclosure

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
. . .
(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

. . .

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551 (1977). This statement of the law dovetails with analogous language found in the Second Restatement of Contracts.[5]

The authors of the Second Restatement of Contracts explain that a party's erroneous assumption about the language of a contract qualifies as a "mistake" under contract law, see

---

[5]     See also the cases cited in footnote 10, *infra*.

Restatement (Second) of Contracts § 151 cmt. a (1981), and that such a mistake will not

necessarily preclude avoidance of the contract on the basis of unilateral mistake, see id. §§

154(b), 157.  On this question the authors state:

> e.  Known mistake as to a writing.  One party cannot hold the other to a writing if
> he knew that the other was mistaken as to its contents or as to its legal effect.  He
> is expected to correct such mistakes of the other party and his failure to do so is
> equivalent to a misrepresentation, which may be grounds either for avoidance
> under § 164 or for reformation under § 166. . . .  The failure of a party to use care
> in reading the writing so as to discover the mistake may not preclude such relief
> (§ 172).  In the case of standardized agreements, these rules supplement that of §
> 211(3), which applies, regardless of actual knowledge, if there is reason to believe
> that the other party would not manifest assent if he knew that the writing
> contained a particular term.  Like the rule stated in Clause (b), that stated in
> Clause (c) requires actual knowledge and is limited to non-disclosure by a party to
> the transaction. [6]  See Comment d.

Id. § 161 cmt. e.  Comment d reads, in part:  "*Known mistake as to a basic assumption*.  In many

situations, if one party knows that the other is mistaken as to a basic assumption, he is expected

to disclose the fact that would correct the mistake."  Id. § 161 cmt. d.

Based on these principles of contract and tort common law, and based on the existence of

a genuine issue of material fact whether Rite Aid knew of Mr. Dubord's basic mistaken

---

[6]     Section 161 of the Restatement of Contracts indicates that "A person's non-disclosure of a fact known to
him is equivalent to an assertion that the fact does not exist in the following cases only:"

> (a)  where he knows that disclosure of the fact is necessary to prevent some previous assertion
> from being a misrepresentation or from being fraudulent or material.

> (b)  where he knows that disclosure of the fact would correct a mistake of the other party as to a
> basic assumption on which that party is making the contract and if non-disclosure of the fact
> amounts to a failure to act in good faith and in accordance with reasonable standards of fair
> dealing.

> (c)  where he knows that disclosure of the fact would correct a mistake of the other party as to the
> contents or effect of a writing, evidencing or embodying an agreement in whole or in part.

> (d)  where the other person is entitled to know the fact because of a relation of trust and
> confidence between them.

Restatement (Second) of Contracts § 161.

assumption, the nondisclosure theory advanced under count III of the complaint contains a trial-worthy issue, assuming it is not now barred by the passage of time.

**B.      Statute of Limitation Defense**

Under Maine law, Rared's tort claims are subject to a six-year statute of limitation, which reads, in relevant part:  "All civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards . . ."  14 M.R.S. § 752.  The Maine Supreme Judicial Court pegs the time of claim accrual at "the time the plaintiff sustains a judicially cognizable injury." Chiapetta v. Clark Assocs., 521 A.2d 697, 699 (Me. 1987).  This is described as "the moment when a wrongful action produces an injury for which a plaintiff is entitled to seek vindication." Northeast Harbor Golf Club, Inc. v. Harris, 1999 ME 38, ¶ 16, 725 A.2d 1018, 1023 (quoting Myrick v. James, 444 A.2d 987, 994 (Me. 1982)).  "Usually  a cause of action sounding in contract accrues when the contract was breached and a cause of action sounding in tort accrues when the plaintiff sustains harm to a protected interest."  Chiapetta, 521 A.2d at 699 (citation omitted).  However, accrual dates for tort claims may vary depending on the nature of the interest at stake.  Cf. Northeast Harbor Golf Club, 725 A.2d at 1023, ¶¶ 15-16.

The parties disagree about the accrual date for Rared's tort claims.  Rite Aid's position is that the tort claims accrued when the lease was executed in 1996.  (Mot. for Summary J. at 8.)  If so, then the tort claims would have expired long before the parties entered into their first tolling agreement in 2007.  Rared's position is that the claims did not accrue until 2004 because, as it happened, no additional rent revenue would have been owed until that year, so no cognizable injury to any interest would have arisen prior to that year.  In Rared's words:  "No injury could have occurred until 2.5% of gross sales (without the prescription drug exclusion) exceeded the minimum rent due pursuant to the lease."  (Pl.'s Opp'n Mem. at 5.)

Contrary to Rared's analysis, Maine law does not tether tort accrual dates to the date on which a plaintiff suffers money damages.  For example, in the professional negligence context the Law Court has held that a claim for negligent services accrues upon performance of the work, even when the plaintiff experiences the pecuniary damages at a later date.  Johnston v. Dow & Coulombe, Inc., 686 A.2d 1064, 1066 (Me. 1996).  In Johnston, the Law Court held that there was a clearly cognizable injury upon completion of a negligently performed survey, even though the plaintiff was unaware of the surveyor's errors.  Id.  The Johnston plaintiffs were owed a duty of care and suffered a cognizable harm when their survey was performed negligently.  Id. Nor does Maine law treat the breach of a tort duty as inconsequential absent actual damages.  On this point the Law Court has observed that "(1) no cause of action accrues until the plaintiff is personally damaged and (2) the law implies nominal damage, at least, from a violation of the plaintiff's rights."  Williams v. Ford Motor Co., 342 A.2d 712, 716 (Me. 1975) (discussing precedent).  In Williams, the Court explained that a tort action "arises when a wrongful act is coupled with an injury, no matter how slight," relying on precedent involving malpractice and official misfeasance.  Id.[7]

Rared complains that Rite Aid breached a duty of disclosure in the course of preparing the lease for the Manchester building and that it would not have executed the lease knowing of the change to the lease template.  Based on this contention, I conclude that the misrepresentation or material omission theories of liability accrued when the lease was executed.  Had Rared been cognizant of Rite Aid's introduction of the prescription drug exclusion immediately after executing the lease, the interests it seeks to advance now (including equitable remedies) would

---

[7]     Williams involved a products liability claim against the manufacturer of a motor vehicle.  There, the Court held that the action did not accrue until the plaintiffs suffered their personal injuries because they were not in privity with the manufacturer at the time of sale and the defect was not patent upon inspection.  Williams, 342 A.2d at 718.

have been equally subject to judicial vindication at that earlier time, even though no pecuniary loss was experienced at that time. This interpretation of Maine law is consistent with interpretations offered by the Maine Superior Court. Peoples Heritage Sav. Bank v. Tom & Jerry's, Inc., Civ. No. 95-234, 1995 Me. Super. Lexis 370, *5 n.3 (Me. Sup. Ct., Cum. Cty. Oct. 16, 1995) (Mills, J.) (finding that misrepresentation counterclaim arising from representations in loan commitment letter accrued on the date of closing); Orr v. Teledyne Inc., Civ. No. CV-93-688, 1994 Me. Super. Lexis 190, *19 (Me. Sup. Ct., Cum. Cty. May 10, 1994) (Lipez, J.) (finding that misrepresentation/failure to warn claim accrued when plaintiff relied on the misrepresentation).[8]

Rared's third count is premised on a duty to disclose and a misrepresentation by omission which gave rise to a judicially cognizable injury upon execution of the lease in 1996. Consequently, this claim was time-barred six years later, in 2002, well before the parties entered into their tolling agreement. The only way that Rared can avoid this result is if the discovery rule would apply under these circumstances and toll the running of the limitations clock until such time as Rared should have become aware of the alleged misrepresentation. Rared contends that the common law would toll the limitation period pending his discovery of the newly-introduced contract term and that 14 M.R.S. § 859 would also do so based on the existence of fraud.

### 1.     *The common law rule*

In Chiapetta, the Law Court considered whether a claim against an insurance agent for failure to procure the proper insurance policy would allow for application of the common law

---

[8]     In Chiapetta v. Clark Assocs., the Law Court sounded a discordant note with an observation that the accrual date might be the date of loss in a case against an insurance agent for failure to procure appropriate coverage. 521 A.2d at 699 n.3. However, the Court did not offer a holding on the issue because using the date of loss as the accrual date barred the claim as effectively as using the date of execution. Id. at 699-700.

discovery tolling rule. The Court held that it would not where "[t]here was nothing inherently unknowable about the lack of coverage since it was an aspect of the contract of insurance." 521 A.2d at 700. However, because the date of the loss was itself beyond the limitation period, the Court fashioned its ruling based on the fact that, at the latest, the plaintiff should have consulted the insurance policy as of the date of loss and should have discovered the inadequacy of the policy at that time. Id. That simple expedient is not available to this Court in this case.

In Myrick v. James, the Law Court considered whether to apply a discovery rule to toll the statute of limitations then applicable to medical malpractice actions and held that it would recognize such a tolling rule in the specific context of "foreign-object surgical malpractice cases." 444 A.2d 987, 989 (Me. 1982) (superseded by statute). This decision followed upon an assessment of a "specific complex of interests" that "places the plaintiff-patient in this specific type of case in a position of blameless ignorance as to the cause of her malady and suffering." Id. at 995. The Court considered this outcome to be consistent with precedent applying the discovery rule in the limited context of a malpractice action involving an attorney title search, where in order to discover the attorney's malpractice the client would have to perform the professional services himself, something inimical to the attorney-client relationship. Id. at 993 (discussing Anderson v. Neal, 428 A.2d 1189 (Me. 1981)). The Court emphasized two factors: (1) that the practitioner's misfeasance in either scenario is not merely unknown to the patient or client, but "unknowable" for all practical purposes and (2) that the patient or client "repose[d] great confidence and trust" in the practitioner. Id. at 995; see also id. at 993 (observing that the attorney's malpractice in a title search is "inherently undiscoverable . . . absent an independent investigation destructive of the confidential relationship between client and attorney"). These justifications for applying a discovery rule do not exist in the instant case. First, it cannot be said

that the existence of the prescription drug exclusion was *unknowable* to Rared. After all, the words were written on the face of the lease. Second, the parties were engaged in a business transaction lacking a special relationship of confidence and trust.

The remaining question is whether the facts and circumstances are sufficient to toll the statute of limitation based on the existence of fraud. Maine common law has long recognized that fraud can toll a statute of limitation. Choroszy v. Tso, 647 A.2d 803, 807 (Me. 1994) (citing Cole v. McGlathry, 9 Me. 131, 132-33 (1832)). I discuss this question in reference to 14 M.R.S. § 859, because Maine statutory law now incorporates tolling based on fraud.

### 2.    *14 M.R.S. § 859*

Title 14 contains the following provision:

> If a person, liable to any action mentioned, fraudulently conceals the cause thereof from the person entitled thereto, or if a fraud is committed which entitles any person to an action, the action may be commenced at any time within 6 years after the person entitled thereto discovers that he has just cause of action . . .

14 M.R.S. § 859 (excluding inapplicable reference to 14 M.R.S. § 3580). According to the Law Court, this statutory tolling provision amounts to "legislative recognition of the fact that dating accrual of an undiscoverable cause of action from the time of injury works an injustice on injured plaintiffs." Anderson v. Neal, 428 A.2d 1189, 1192 (Me. 1981). It applies in two different scenarios. "The first involves the fraudulent concealment from the plaintiff of the existence of a cause of action. The second concerns the situation in which the claim is itself grounded upon fraud." Westman v. Armitage, 215 A.2d 919, 922 (Me. 1966). "The statute of limitations begins to run . . . 'when the existence of the cause of action or fraud is discovered or should have been discovered by the plaintiff in the exercise of due diligence and ordinary prudence.'" Kobritz v. Severance, 2007 ME 3, ¶ 13, 912 A.2d 1237, 1241 (quoting Westman, 215 A.2d at 922).

Rared contends that Rite Aid engaged in fraud by omission when it inserted new language into the lease template and presented it to Rared for execution without notifying Rared of the insertion of the new language. In Rared's view, Rite Aid concealed a material change to their preexisting understanding and purposefully sought to take advantage of Rared's trust. The elements of a fraud claim require proof (1) that the defendant made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it was true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance, where (5) the other person justifiably relied on the representation as true and acted to his or her detriment. Grover v. Minette-Mills, Inc., 638 A.2d 712, 716 (Me. 1994). When the plaintiff advances a claim of fraud based on misrepresentation by omission, Maine law modifies these elements by requiring the plaintiff to "prove either (1) active concealment of the truth, or (2) a specific relationship imposing on the defendant an affirmative duty to disclose." Fitzgerald v. Gamester, 658 A.2d 1065, 1069 (Me. 1995). The discussion focuses on these latter two requirements.

"'Active concealment of the truth' connotes steps taken by a defendant to hide the true state of affairs from the plaintiff." Kezer v. Mark Stimson Assocs., 1999 ME 134, ¶ 24, 742 A.2d 898, 905 (quoting Fitzgerald, 658 A.2d at 1069). A specific relationship imposing an affirmative duty to disclose could be either a fiduciary relationship or a relationship or transaction that triggers a statutory duty to disclose. Glynn v. Atlantic Seaboard Corp., 1999 ME 53, ¶ 12, 728 A.2d 117, 120 (citing Binette v. Dyer Library Ass'n, 688 A.2d 898, 903 (Me. 1996) (statutory duty to disclose) and Brae Asset Funds L.P. v. Adam, 661 A.2d 1137, 1140 (Me. 1995) (fiduciary duty to disclose)). For reasons already discussed, the record does not support the imposition of a fiduciary duty. Additionally, Rared has not identified any applicable

statutory disclosure requirement. Thus, the only remaining question is whether the record shows "active concealment" of the truth concerning a material fact.

I conclude that the record is insufficient to support a finding that Rite Aid took steps to hide the existence or non-existence of a fact from Rared. It is undisputed that Rite Aid presented Rared with a lease containing, on its face, a payment term different than the one used in prior dealings. Rared assumed that the language was other than it was, but Rite Aid did not make a false representation in response, breach any prior promise that the lease template would remain inviolate, or actively conceal any facts to generate that mistaken assumption. While nondisclosure of another party's mistake can be sufficient to allow for rescission of a contract and related remedies, I am not comfortable with the notion that the nondisclosure here rose to the level of a fraud perpetuated by active concealment, which is the standard for tolling pronounced in Fitzgerald, 658 A.2d at 1069.[9] I recognized that the restatements' authors allude to nondisclosure as a species of misrepresentation, in effect, but the distinction between fraudulent

---

[9] There is Maine common law holding that it is a species of fraud to knowingly take advantage of another party's ignorance. However, those cases that do not clearly involve agency or partnership duties do involve active concealment and misrepresentation of existing facts, see Cummings Mfg. Co. v. Smith, 113 Me. 347, 351, 93 A. 968, 970 (1915) (failure to disclose to creditor that corporation receiving credit was no longer a going concern while requesting credit in that corporation's name); Lapish v. Wells, 6 Me. 175, 191 (1829) (affirming judgment that partly rescinded a land grant where the grantee made it appear to the committee for the sale of eastern lands, appointed by the Commonwealth of Massachusetts, that he was entitled to an entire tract, despite the existence of a prior conveyance of one acre to another, which conveyance was known to him), as opposed to an issue concerning the unambiguous wording of a proposed contract that was not orally flagged prior to contract execution. The closest Maine case that I have been able to find is Hudson Structural Steel Co. v. Smith & Rumery Co., 110 Me. 123, 124-25, 85 A. 384, 385 (1912). The opinion in that case was fashioned based on certain stipulations and the report of a referee and it appears that the plaintiff steel supplier was not privy to the terms of a construction contract between defendant builder, Smith & Rumery Co., and co-defendant Masonic Trustees of Portland, who were building two dormitories for their "Maine Home for the Feeble Minded." 110 Me. at 124-125, 85 A. at 385. That building contract incorporated certain building specifications indicating that two buildings were to be constructed, whereas "[t]here was nothing in the iron and steel items to indicate that the specifications were intended to cover more than one building." 110 Me. at 125, 85 A. at 385. By appearances, the defendants communicated information to the plaintiff different from what was in the building contract and specifications. In its opinion, the Court entered judgment for the plaintiff that rescinded a contract to supply steel at a price that was offered based on the plaintiff's assumption that only one building was involved, where the defendant contractor had a firm basis for understanding that the plaintiff was contracting on a mistaken assumption as to the number of buildings and should have known from experience that the offered price would not cover the cost of the steel needed for two buildings. 110 Me. at 125-127, 85 A. at 385-86. The case is potentially distinguishable from the case at hand because here Rared's mistake concerned the language of a contract term that appeared on the face of the contract it executed.

active concealment and implied misrepresentation through nondisclosure strikes me as a material distinction in the context of a tolling requirement calling for fraud.  For that reason, my recommendation is that the Court grant the defendant's motion for summary judgment on the basis of the six-year statute of limitations.  Should the Court disagree with this recommendation concerning count III, it should still grant the motion, in part, and dismiss count one as conceded and count two as unsupported by evidence of a fiduciary relationship.

**Conclusion**

For the reasons stated above, I recommend that the Court GRANT Defendant's Motion for Summary Judgment (Doc. No. 18).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

September 6, 2011